**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------x

In re:

MODERN LAND (CHINA) CO., LTD.,

Debtor in a Foreign Proceeding.

------------------------------------------------------------------------x

**FOR PUBLICATION**

Chapter 15

Case No. 22-10707 (MG)

## REVISED MEMORANDUM OPINION GRANTING
## MOTION FOR RECOGNITION AND RELATED RELIEF

*A P P E A R A N C E S :*

SIDLEY AUSTIN LLP
*Counsel to the Foreign Representative*
787 Seventh Avenue
New York, NY 10019
By:    Anthony Grossi, Esq.

MAPLES AND CALDER (CAYMAN) LLP
*Attorneys for Debtor in a Foreign Proceeding for the Cayman Islands*
Ugland House
South Church Street
Grand Cayman, KYI-1104
By:    Caroline Moran

KIRKLAND ELLIS LLP
*Attorneys for the Ad Hoc Group*
26th Floor, Gloucester Tower, the Landma
15 Queen's Road Central
Hong Kong, 00000
By:    Willa Wang, Esq.

KIRKLAND ELLIS LLP
*Attorneys for the Ad Hoc Group*
300 N. Lasalle
Chicago, IL 60654
By:    Heidi Hockberger, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

This case raises the important questions of whether and when, under Chapter 15 of the

Bankruptcy Code, a bankruptcy court may recognize and enforce a scheme of arrangement

sanctioned by a court in the Cayman Islands, the debtor's place of incorporation, that modifies or

discharges New York law governed debt. The Debtor here is a holding company for a large

group of businesses, most of which are incorporated in the Cayman Islands or the British Virgin

Islands ("BVI"), but that conduct most or all of their business in the People's Republic of China

("PRC"). Based on the UNCITRAL Model Law on Cross-Border Insolvency, Chapter 15 adopts

the center of main interest ("COMI") concept, permitting recognition of a foreign proceeding in

a debtor's center of main interest (a "foreign main proceeding") or, alternatively, recognition of a

"foreign nonmain proceeding" in a place where the debtor maintains an "establishment." While

the statute establishes a presumption that a debtor's COMI is its place of incorporation, the

presumption can be overcome where other factors support finding the COMI to be elsewhere.

Should this Debtor's Cayman sanctioned Scheme be recognized and enforced by this Court? On

the facts of this case, the Court concludes the answer is yes. For the reasons explained below,

this Court **GRANTS** the Motion recognizing the Cayman Proceeding as a foreign main

proceeding and recognizing and enforcing the Scheme.

## I.   BACKGROUND

### A.   The Motion for Recognition and Enforcement

Pending before the Court is the *Motion for (I) Recognition of a Foreign Main*

*Proceeding, (II) Recognition of a Foreign Representative, and (III) Related Relief under Chapter*

*15 of the Bankruptcy Code* (the "Motion," ECF Doc. # 4), filed by Mr. Zhang Peng, in his

capacity as the authorized foreign representative (the "Foreign Representative") of Modern Land

(China) Co., Limited (the "Debtor").  A proposed recognition order is attached to the Motion as

Exhibit A.  ("Proposed Recognition Order," ECF Doc. # 4-1.)  The Debtor is the subject of a

foreign proceeding (the "Cayman Proceeding") concerning a scheme of arrangement (the

"Scheme" or "Cayman Scheme") between the Debtor and certain holders of the existing notes

(the "Scheme Creditors"), under section 86 of the Cayman Islands Companies Act 2022 (the

"Companies Act") and currently pending before the Grand Court of the Cayman Islands (the

"Cayman Court").

The following declarations were filed in support of the Motion: (i) a declaration of the

Foreign Representative ("Peng Declaration," ECF Doc. # 5); (ii) a declaration of the Debtor's

Cayman Islands counsel, Caroline Moran ("Ms. Moran") (ECF Doc. # 6); and (iii) the Foreign

Representative's statements required by section 1515(c) of the Bankruptcy Code and Rule

1007(a)(4) of the Federal Rules of Bankruptcy Procedure (ECF Doc. # 3).  The Foreign

Representative also filed supplemental briefing addressing the *In the Matter of Rare Earth*

*Magnesium Technology Group Holdings Limited* [2022] HKCFI 1686 ("Rare Earth Briefing,"

ECF Doc. # 12) and *In the Matter of an application for recognition and assistance by the*

*provisional liquidator of Global Brands Group Holding Limited (in liquidation)*, HCMP

644/2022, [2022] HKCFI 1789 ("Global Brands Briefing," ECF Doc. # 19.)

The objection deadline was set for June 29, 2022, at 4:00 p.m.  (*See* ECF Doc. # 9.)

There were no objections filed in response to the Motion.  The hearing to sanction the Scheme by

the Cayman Court was scheduled for July 5, 2022, at 11:00 a.m.  (Motion ¶ 34.)

On July 5, 2022, the Debtor filed a supplemental declaration of Ms. Moran addressing the

hearing to sanction the Scheme.  ("Supplemental Moran Declaration," ECF Doc. # 20.)  Annexed

to the Supplemental Moran Declaration as Exhibit A is a report of the scheme meeting held on

June 30, 2022 (ECF Doc. # 20-1) and as Exhibit B a copy of the order sanctioning the Scheme issued by the Cayman Court ("Sanction Order," ECF Doc. # 20-2).

A hearing on the Motion was held on July 7, 2022. At the hearing, the Court directed the Foreign Representative's counsel to file further supplemental briefing by July 12, 2022. On July 12, 2022, the Foreign Representative filed (i) a supplemental brief ("Supplemental Brief," ECF Doc. # 23), (ii) a second declaration by the Foreign Representative ("Supplemental Peng Declaration," ECF Doc. # 24), and (iii) a third declaration by Ms. Moran ("Third Moran Declaration," ECF Doc. # 25).

### B.    The Debtor's Business Operations and Preexisting Capital Structure

On June 28, 2006, the Debtor was incorporated in the Cayman Islands under the Companies Act as an exempted company with limited liability. (Motion ¶ 6.) The Debtor is the ultimate holding company of a group of companies comprising the Debtor and its subsidiaries, including the following: Great Trade Technology Ltd., a holding company incorporated with limited liability in the BVI; the Modern Land HK Companies; and Jiu Yun Development Co., Ltd., a holding company incorporated with limited liability in Hong Kong (collectively with Great Trade Technology Ltd., the Modern Land HK Companies, and together with the Debtor, the "Company"), that carries out real estate investment and development in the PRC and the United States. (*Id.* ¶ 7.) The Company is a property developer focused on eco-friendly residences in the PRC with four product lines: MOMA; Modern Eminence MOMA; Modern Horizon MOMA; and Modern City MOMA. (*Id.* ¶¶ 8, 10.)

As of June 30, 2021, the Company had a contracted sales gross floor area of 2.08 million square meters and aggregate unsold gross floor area of 16.77 million square meters in the PRC.

(*Id.* ¶ 11.)  During the first half of 2021, the Company purchased a total of 20 new projects with an aggregate gross floor area of 3.56 million square feet.  (*Id.*)

The Debtor's shares have been listed on the Stock Exchange of Hong Kong Limited since July 12, 2013.  (*Id.* ¶ 9.)  As of December 31, 2021, the authorized share capital of the Debtor was $80 million divided into eight billion ordinary shares of a par value of $0.01 each, of which 2.79 billion of the ordinary shares were issued and fully paid.[1]  (*Id.*)  As of June 30, 2021, the Company's total indebtedness was $4.32 billion, including: (i) short-term borrowings of $972.33 million; (ii) long-term borrowings of $1.92 billion; and (iii) bonds payable of $1.42 billion.  (*Id.* ¶ 12.)  Additionally, as of June 30, 2021, the Company's contingent liabilities amounted to $2.57 billion.  (*Id.*)

As part of the Company's $1.42 billion of bonds payable, the total principal amount outstanding under the existing notes ("Existing Notes") is $1.34 billion.  (*Id.* ¶ 13.)  The Existing Notes are the subject of the Scheme with each series of notes issued by the Debtor having different maturity dates and different interest rates.  (*Id.* ¶¶ 13–14.)  The remaining indebtedness is not being restructured and will be unaffected by the Scheme and this Chapter 15 case.  (*Id.* ¶ 14.)  As of June 30, 2021, the Debtor's current assets amounted to $12.49 billion on a consolidated basis[2] and these assets were located in the PRC and the United States.  (*Id.* ¶ 15.)  Some of the assets were pledged to secure certain banking and other facilities granted to the Company and mortgage loans granted to buyers of sold properties.  (*Id.*)

---

[1]    All dollar amounts are calculated in USD.

[2]    As of June 30, 2021, the Company's current assets consist of the following: a) inventory of $145.79 million; b) properties under development for sale of $6.92 billion; c) properties held for sale of $895 million; d) trade and other receivables of $1.78 billion; e) amount due from related parties of $129.27 million; f) restricted cash of $570.69 million; and g) bank balances and cash of $2.06 billion.  (Motion ¶ 15.)

### C.    The Cayman Proceeding

Market concerns over the operations of Chinese property developers were intensified due to reduced lending for real estate development, the impact of COVID-19 on macroeconomic conditions, and certain negative credit events.  (*Id.* ¶ 18.)  These conditions led the Company to experience liquidity pressures due to limited access to external capital to refinance debt and reduced cash generated from sales.  (*Id.*)  The Company failed to meet two repayments arranged for October 2021 and February 2022 which constituted events of default.  (*Id.*)  These amounts remain unpaid.  (*Id.*)

On October 26, 2021, the Debtor appointed Sidley Austin LLP as its legal advisor.  (*Id.* ¶ 20.)  On November 5, 2021, the Debtor appointed Houlihan Lokey (China) Limited as its financial advisor.  (*Id.*)  The Company commenced discussions with the ad hoc group of holders of the Existing Notes, who are advised by Kirkland & Ellis LLP.  (*Id.* ¶ 19.)

On February 25, 2022, after negotiations with the ad hoc group, the Debtor entered into a restructuring support agreement (the "RSA") with the Scheme Creditors.  (*Id.* ¶ 21; *see also* Peng Decl., Ex. A.)  As of May 31, 2022, certain Scheme Creditors holding $1,083,272,000 of the Existing Notes—representing 80.75% of the aggregate outstanding principal amount of all Existing Notes—had agreed to the RSA.  (Motion ¶ 24.)

On April 14, 2022, the Debtor filed a petition (the "Scheme Petition," ECF Doc. # 6-1) with the Cayman Court commencing the Cayman Proceeding, seeking an order that (i) directed the Company to convene a meeting on the Scheme for a single class of creditors only (the "Scheme Meeting"), (ii) requested a convening hearing (the "Convening Hearing"), and (iii) sought the appointment of the Foreign Representative.  (*Id.* ¶ 32.)  Following the Convening Hearing on May 31, 2022, the Cayman Court entered the order (the "Convening Order")

scheduling the Scheme Meeting for June 29, 2022, scheduling the Sanction Hearing for July 5, 2022, and appointing the Foreign Representative. (*Id.* ¶ 34; Peng Decl., Ex. B.)

The Convening Order states that Scheme Creditors will be notified properly of the Scheme Meeting and will have the opportunity to raise questions and objections to the Scheme at the Scheme Meeting and/or at the Sanction Hearing. (Motion ¶ 37; Peng Decl., Ex. B.) At the Scheme Meeting, a vote will be held to determine whether the Scheme Creditors that are present and voting in person or by proxy will approve the Scheme. (Motion ¶ 38.) If a majority of creditors representing at least seventy-five percent in value of the Scheme Creditors present and voting at the Scheme Meeting votes in favor of the scheme, the Scheme is approved.[3] (*Id.*)

### D.    Description of the Scheme and Issuance of New Notes

The Scheme's effect will be to release the Scheme Creditors' claims related to the Existing Notes documents. (*Id.* ¶ 26.) In return, each Scheme Creditor will receive a pro rata share of the following consideration (the "Scheme Consideration"): cash consideration of $22.916 million; and the new notes ("New Notes"), in an aggregate principal amount equal to the sum of (i) 98.3% of the outstanding principal amount of the Existing Notes held by the Scheme Creditors; and (ii) accrued and unpaid interest up to but excluding the day the restructuring becomes effective (the "Restructuring Effective Date"). (*Id.*) This will enable the Company to restructure its existing indebtedness under the Existing Notes. (*Id.* ¶ 28.) The Debtor will also be issuing the New Notes on the Restructuring Effective Date. (*Id.*)

On the Restructuring Effective Date, following the distribution of the Scheme Consideration and the issuance of the New Notes, all outstanding Existing Notes will be

---

[3]    As detailed in Section I.G., below, the Scheme Creditors voted overwhelmingly to approve the Scheme—99% in number and 94.8% in amount. No objections to the Scheme were raised either in connection with the Cayman sanction hearing or this Court's recognition hearing.

canceled and all guarantees in connection with the Existing Notes will be released.  (*Id.* ¶ 29.)

Additionally, the Scheme provides for releases by Scheme Creditors of any claim related to the

restructuring against the Debtor and its affiliates.  (*Id.* ¶ 30.)  If the Scheme is approved by the

requisite majorities of creditors and sanctioned by the Cayman Court with a sealed copy of the

Sanction Order filed with the Cayman Islands Registrar of Companies, the Scheme will then

bind all Scheme Creditors regardless of how, or if, they voted.  (*Id.* ¶ 31.)

        **E.**       **Rare Earth Briefing**

      On June 6, 2022, the High Court of the Hong Kong Special Administrative Region Court

of First Instance (the "Hong Kong Court") ruled in *In the Matter of Rare Earth Magnesium*

*Technology Group Holdings Limited* [2022] HKCFI 1686 (the "*Rare Earth* Opinion").  In dicta,

the *Rare Earth* Opinion speculated that "recognition under *Chapter 15* is limited in territorial

effect and I think it is reasonable to assume that the reason for this is that the procedure does not

discharge the debt." *Rare Earth* Opinion ¶ 36.  The *Rare Earth* Opinion relies heavily upon this

Court's decision in *In re Agrokor d.d.*, 591 B.R. 163, 169 (Bankr. S.D.N.Y. 2018).  Specifically,

the Hong Kong Court points to this Court's explanation that "Section 1520(a)(1) provides that

the automatic stay will apply to all the debtor's property *that is located within the territorial*

*jurisdiction of the United States*." *Rare Earth* Opinion ¶ 35 (citing *In re Agrokor*, 591 B.R. at

187).  From this statement, the Hong Kong Court concludes that "[r]ecognition does not appear

as a matter of United States' law to discharge the debt." *Id.* ¶ 36.

      On June 17, 2022, the Debtor filed the Rare Earth Briefing noting that the Hong Kong

Court's statements principally rely on the application of United States law.  (Rare Earth Briefing

¶ 8.)  The Debtor notes that a federal court's Chapter 15 order that recognizes a discharge of

New York law governed debt granted in a foreign proceeding is a complete and valid discharge

of that debt as a matter of United States law.  (*Id.* ¶ 9.)  The Debtor asserts that because the

Proposed Recognition Order recognizes a discharge to the extent granted in the foreign Cayman

Proceeding, it serves as a complete and valid discharge of the Existing Notes, which are

governed by New York law, as a matter of New York state law.  (*Id.*)

This is a critically important issue.  The Scheme in this case, and in many other scheme

or restructuring plan cases, modifies or discharges existing debt and related guarantees governed

by New York law, and provides for the issuance of new debt and guarantees governed by New

York law.  An indenture trustee will only take the actions authorized by the scheme or plan if

enforceable orders have been entered by the foreign court and a Chapter 15 court.

With great respect for the Hong Kong court in *Rare Earth*, that court misinterprets this

Court's earlier decision in *Agrokor*, as well as many other decisions in the United States which

have recognized and enforced foreign court sanctioned schemes or restructuring plans that have

modified or discharged New York law governed debt.  Provided that the foreign court properly

exercises jurisdiction over the foreign debtor in an insolvency proceeding, and the foreign court's

procedures comport with broadly accepted due process principles, a decision of the foreign court

approving a scheme or plan that modifies or discharges New York law governed debt is

enforceable.  Under U.S. law, that is an unremarkable proposition that has been firmly

established in the U.S. at least since the Supreme Court decision in *Canada Southern Ry. Co. v.

Gebhard*, 109 U.S. 527 (1883), which granted international comity and enforced a Canadian

scheme that discharged New York law governed debt and provided for the issuance of new debt

governed by New York law.  As Chief Justice Waite said in *Gebhard*, "the true spirit of

international comity requires that schemes of this character, legalized at home, should be

recognized in other countries."  *Id*. at 548.  Chapter 15 limits a U.S. bankruptcy court's authority

to enjoin conduct outside the territorial jurisdiction of the United States, but it does not make a

discharge of New York law governed debt any less controlling.

To be clear, in recognizing and enforcing the Scheme in this case, the Court concludes

that the discharge of the Existing Notes and issuance of the replacement notes is binding and

effective.[4]

### F.    The Global Brands Briefing

#### 1.    <u>The Debtor Does Not Intend or Expect to Seek Recognition of the Scheme or any Chapter 15 Order of this Court in Hong Kong</u>

The Court entered an order on June 27, 2022 (ECF Doc. # 18) requiring the Foreign

Representative to file a supplemental brief addressing another recent Hong Kong court judgment,

*In the Matter of an application for recognition and assistance by the provisional liquidator of*

*Global Brands Group Holding Limited (in liquidation)*, HCMP 644/2022, [2022] HKCFI 1789

("*Global Brands*").  The court in *Global Brands* stated that, in the future, recognition and

enforcement by the Hong Kong court of schemes sanctioned in the Cayman Islands and BVI

depended upon common law principles developed by Hong Kong courts that would ordinarily

apply a center of main interests test rather than the place of incorporation as had been done in the

past.  Because the Debtor and its affiliates conduct their business in the PRC, and the Debtor's

common stock trades on the Stock Exchange of Hong Kong Limited, this Court wanted to know

whether the Debtor intends to seek recognition and enforcement in Hong Kong of the Cayman

Scheme and of any order of this Court recognizing and enforcing the Cayman Scheme.  In short,

the Foreign Representative's answer is that the Debtor does not intend or expect to seek

---

[4]      What *Agrokor* discussed at length (and will not be repeated here) is that English and some commonwealth
courts continue to apply the *Gibbs* Rule, based on an 1890 decision of the Court of Appeal in A*ntony Gibbs & Sons v.
La Societe Industrielle et Commerciale et Metaux* (1890) 25 QBD 399, which refuses to recognize a discharge or
modification of English law governed debt approved by a court outside of England.  *See Agrokor*, 591 B.R. at
192–96.

recognition and enforcement of the Scheme or this Court's order recognizing and enforcing the Scheme in Hong Kong.

Given that the Existing Notes are issued by a Cayman Islands entity and are governed by New York law, the Foreign Representative submits that the implementation and effectuation of a Cayman Islands scheme of arrangement and recognition and enforcement of the scheme under Chapter 15 of the Bankruptcy Code are all that is required to effectuate the Restructuring. (Global Brands Briefing ¶ 5.)  Further, the Foreign Representative notes that the solely affected creditors, the holders of the Existing Notes, also agree with this position.  (*Id.* ¶ 6.)  The RSA and the Scheme documents, which were negotiated at arm's-length with sophisticated creditors represented by able counsel, do not require recognition of the Scheme in Hong Kong.  (*Id.*)

2.    The Scheme Can Become Effective Without Recognition in Hong Kong

According to the Foreign Representative, nothing in the RSA or in any of the Scheme documents necessitates or requires recognition and/or enforcement of the Scheme by the Hong Kong Court for the Scheme to be effective.  (*Id.* ¶ 8.)  Under the terms of the Scheme, once the Cayman Court sanctions the Scheme and the Sanction Order has been delivered to the Cayman Companies Registrar, the Scheme will become effective.  (*Id.*)  The Foreign Representative notes that the restructuring will ultimately become effective upon entry of the Sanction Order by the Cayman Court and the Proposed Recognition Order by this Court.  (*Id.*)  Further, the Foreign Representative argues that this Court does not need to consider whether the Scheme would be recognized and enforced in Hong Kong in making its determination whether to recognize and enforce the Scheme pursuant to section 1521 of the Bankruptcy Code.  (*Id.* ¶ 9.)  This argument relies on the *Agrokor* case, where this Court enforced the modification of both English law and New York law-governed debts pursuant to a Croatian insolvency proceeding, even though

jurisdictions following the *Gibbs* Rule may not have treated the modification of English law-governed debts as effective.  (*Id*. ¶ 10.)

    3.  <u>Global Brands is Distinguishable</u>

  The Foreign Representative believes it is unlikely that a court in Hong Kong will be asked to consider whether the Scheme is effective in Hong Kong.  (*Id.* ¶ 15.)  The Foreign Representative does not intend to seek relief in Hong Kong or to obtain any assets located in Hong Kong, and they argue the risk of a dissenting Scheme Creditor seeking enforcement of the Existing Notes in Hong Kong is de minimis.  (*Id*.)  It is, of course, for the Debtor to decide whether to seek recognition and enforcement in Hong Kong, and for Hong Kong Court to decide whether to recognize and enforce the Scheme if the issue is presented by the Debtor or any other party that has standing to raise the issue in Hong Kong.

  **G.**  **The Outcome of the Cayman Proceeding**

  Ms. Moran notes that the Scheme Creditors overwhelmingly approved the Scheme in the required majorities.  (Supp. Moran Decl. ¶ 4.)  Ms. Moran states that there were 372 creditors who voted (and one creditor that abstained), with over 99% (370) of those voting to support the Scheme.  (*Id.*)  Further, the supporting creditors represented 94.78% ($1,271,425,000) of the total principal amount outstanding under the Existing Notes.  (*Id.*)  Only two creditors voted against the Scheme representing less than 1.23% ($16,319,000) of the total principal amount outstanding under the Existing Notes.  (*Id.*)

  On July 5, 2022, the Cayman Court presided over the Sanction Hearing and found that the Scheme satisfied the requisite elements to be sanctioned.  (*Id.* ¶ 7.)  Ms. Moran notes that no creditor raised any objection during the Sanction Hearing.  (*Id.*)  The Cayman Court entered the Sanction Order which sanctions and approves consummation of the Scheme and authorizes and effectuates the Scheme Restructuring.  (*Id.* ¶ 8.)

### H.    Supplemental Briefs

A hearing on the Motion was held on July 6, 2022. ("Transcript," ECF Doc. # 21.) The Court expressed its concerns regarding the Debtor's COMI and, with respect to possible recognition as a foreign nonmain proceeding, whether the Debtor established that it was engaged in "non-transitory activity." (Transcript at 45:6–24.) Counsel to the Foreign Representative filed the Supplemental Brief on July 12, 2022.

The Debtor asserts that it's COMI is in the Cayman Islands because it is, and publicly identifies as, a Cayman-incorporated company. (Supp. Brief ¶ 1.) The Foreign Representative states that the Debtor's historical corporate counsel is a Cayman Islands law firm, Conyers Dill & Pearman, which provided general corporate advice on the issuance of the Existing Notes. (*Id.* ¶ 2.) The offering memoranda for the Existing Notes make clear that the Debtor is a Cayman entity. (*Id.* ¶ 3.) The Debtor notes that when it first defaulted under the Existing Notes, BFAM Asian Opportunities Master Fund, LP ("BFAM,") issued a "statutory demand" (the "Statutory Demand") against the Debtor, threatening a winding up petition that would be filed under the laws of the Cayman Islands. (*Id.* ¶ 4.) The Statutory Demand prompted the restructuring negotiations and the RSA. (*Id.* ¶ 5.)

### 1.    Insolvency Procedures in the Cayman Islands

The Debtor notes that liquidation of a Cayman Islands incorporated company is required to be implemented pursuant to Cayman law through insolvency practitioners appointed by the Cayman Court. (*Id.* ¶ 5 (citing Third Moran Decl. ¶¶ 16–18).) The Cayman courts generally do not recognize a non-Cayman Islands liquidation as being capable of liquidating and dissolving a Cayman Islands company. (*Id.* (citing Third Moran Decl. ¶¶ 18–23).)

The Foreign Representative notes that most of the Restructuring-related activities took place in the Cayman Islands. (Supp. Peng Decl ¶ 6.) Maples and Calder (Cayman) LLP

("Maples"), the Debtor's Cayman counsel since November 2021, advised the Debtor with respect to practical elements of the Restructuring during negotiations of the RSA. (Third Moran Decl. ¶ 25.) The RSA put Scheme Creditors on notice that the proceeding to sanction the Scheme would occur in the Cayman Islands. (Supp. Brief ¶ 8.) The Debtor completed each of the steps needed to sanction the Scheme by the Cayman Court. (Supp. Peng Decl. ¶ 10.) These steps included holding the Scheme Meeting in the Cayman Islands that was chaired by an individual who resides in the Cayman Islands and was engaged directly by the Debtor for the purposes of the Scheme Meeting. (Third Moran Decl. ¶ 25.) The chairman of the Scheme Meeting held proxies for the majority of the Scheme Creditors and attended and voted at the meeting in the Cayman Islands on their behalf. (*Id.*)

2.    <u>Debtor's Arguments in Favor of Foreign Main</u>

The Debtor relies on the Scheme Creditor's expectations that the Debtor's COMI is the Cayman Islands. (Supp. Brief ¶ 11.) The Debtor notes that creditor expectations were formed via the publicly available descriptions of the Debtor in (i) the offering memoranda of the Existing Notes that stated that "an insolvency proceeding relating to us, even if brought in the United States, would likely involve Cayman Islands insolvency law" and (ii) the Debtor's press releases, pointing to the Debtor as a company "incorporated in the Cayman Islands." (*Id.*) The Debtor notes that creditor expectations were reinforced by certain actions including: (i) BFAM's negotiations related to the Restructuring by issuing the Statutory Demand and threatening a Cayman Islands winding up petition and (ii) the RSA contemplating an insolvency proceeding in the Cayman Islands. (*Id.*)

The Debtor notes that no Scheme Creditor—including the two Scheme Creditors that voted against the Scheme—objected to the Debtor's COMI being in the Cayman Islands. (*Id.* ¶

12.)  The Debtor argues that the consensus of those affected by the Scheme points in favor of a

Cayman COMI.  (*Id.*)

The Debtor notes that Cayman Islands law requires that liquidation proceedings of

Cayman Islands-incorporated companies take place in the Cayman Islands under the supervision

of a Cayman Islands-appointed liquidator.  (*Id.* ¶ 13.)  This requirement was made clear in the

documents related to the issuance of the Existing Notes.[5]  (*Id.*)

The Debtor maintains its registered office in the Cayman Islands to which all

communications may be addressed, and where matters such as the administration of annual

filings and the payment of annual fees with the Cayman Registrar are dealt with.  (*Id.* ¶ 14.)  The

Debtor is also required to maintain statutory registers of members (*i.e.*, shareholders), mortgages

and charges, and directors in the Cayman Islands.  (*Id.*)

The Debtor is also tied to the Cayman Islands by way of its asset holdings and the

location of certain creditors.  (*Id.* ¶ 15.)  Nearly half of the Debtor's wholly owned direct

subsidiaries are Cayman entities.  (*Id.*)  Additionally, the Debtor identified at least 35 entities—

representing a minimum of over half a billion dollars of the outstanding principal of the Existing

---

[5]      The Debtor's argument is misleading.  Neither the Debtor nor any of its creditors filed a winding up
petition that would have resulted in the appointment by the Cayman court of one or more provisional liquidators,
who are independent fiduciaries.  *See* Cayman Companies Act §§ 94, 104.  Rather, here, the Debtor filed the
Scheme Petition under section 86 of the Cayman Companies Act, which does not by itself result in the appointment
of JPLs.  The benefit of a winding up order is that it enables the court in appropriate cases to issue a moratorium
similar to our automatic stay preventing creditors from taking action to recover on their claims while the parties try
to reach agreement on a scheme.

The Cayman court in this case issued the Convening Order appointing the Debtor's president as the Foreign
Representative and scheduling the Scheme Meeting.  No JPLs were appointed, meaning that there was no
independent fiduciary overseeing the process.  The Debtor and its professionals had already negotiated the RSA and
were proceeding rapidly to a consensual scheme of arrangement without the necessity of a winding up petition, JPLs
and a moratorium.

In many Cayman cases where the debtor hopes to negotiate a scheme of arrangement, a winding up order
and appointment of JPLs precedes the negotiation of the scheme.  Such matters are often referred to as a "light
touch" restructuring.  *See In the Matter of Midway Resources Int'l*, Grand Court of the Cayman Islands, Cause
Number: FSD 51 of 2021 (NSD) (Nicholas Segal J.) (30 March 2021), at [68] ("I am satisfied that this is an
appropriate case in which the PLs should be appointed on a soft touch basis (although I would reiterate my plea to
substitute 'light-touch' for 'soft touch', since the latter expression has always seemed to me to bring with it
associations of someone being duped and defrauded!").

Notes—that are domiciled in the Cayman Islands. (*Id.*) But it is undisputed that despite its domicile in the Cayman Islands, the Debtor and its affiliates are managed and conduct their business in the PRC.

Finally, the Debtor's restructuring activities have been centralized in the Cayman Islands and undertaken by Cayman Islands actors. (*Id.* ¶ 16.) These activities include: (i) Maples advising the Debtor on all aspects of the Restructuring, including the terms of the RSA, the Practice Statement Letter, the Explanatory Statement, and all Cayman Court documents; (ii) preparing for and appearing at hearings in front of the Cayman Court in the Cayman Islands; (iii) the convening of the Scheme Meeting by the Cayman Court; and (iv) the Scheme Meeting, which was chaired by an individual who resides in the Cayman Islands, was engaged directly by the Debtor for the purposes of the Scheme Meeting, and who held proxies for the majority of the Scheme Creditors and attended and voted at the Scheme Meeting in the Cayman Islands on their behalf. (*Id.*) The Debtor notes that its board of directors did not host meetings that were physically located in the Cayman Islands during the restructuring due to international travel restrictions and changes in business practices resulting from the COVID-19 pandemic. (*Id.*)

The Debtor also argues that it was not necessary for its Cayman counsel or its Scheme Chairperson to wrest control of the Debtor from its previously existing management or take possession of its property like a joint provisional liquidator ("JPL"). (*Id.*) The Debtor asserts that such activities are not required or appropriate in a consensual scheme of arrangement. (*Id.*) A scheme of arrangement, by its nature, is driven by negotiation and compromises between a company and its creditors. (*Id.*) The Debtor argues that holding scheme chairpersons to the same standard as a JPL would create a perverse incentive for companies to enter into liquidations rather than a value maximizing, consensual resolution with their creditors via a scheme of

arrangement.[6]  (*Id.*)  The Debtor argues that this would dictate that the restructuring activities in

liquidations, but not schemes, would merit recognition under Chapter 15.  (*Id.*)

### 3.  Foreign Nonmain Arguments

The Debtor asserts that it has substantial connections to the Caymans including issuing

debt and holding assets in the Caymans, retaining counsel and employing professionals in the

Caymans, and holding itself as an entity that could only be liquidated effectively in the Caymans.

(*Id.* ¶ 19.)  The Debtor argues that this is sufficient to find that the Debtor has non-transitory

business connections with the Caymans.  (*Id.*)  The Debtor notes that its maintenance of a

registered office in the Cayman Islands, compliance with the corporate formalities required to

maintain its status as a Cayman entity, and representations to creditors that it is a Cayman-

incorporated entity also support finding non-transitory connections with the Caymans.  (*Id.*)

The Debtor also argues that the alternative to recognition of the Cayman Proceeding is to

potentially deny the Debtor the ability to implement a consensual restructuring and force the

Debtor into a Cayman liquidation.  (*Id.* ¶ 20.)  The Debtor argues that it would leave all parties in

a worse position.  (*Id.*)

## II.  **LEGAL STANDARD**

### A.    **Foreign Main Proceeding**

To obtain recognition, the foreign proceeding must be either a foreign main or foreign

nonmain proceeding.  11 U.S.C. § 1517(a)(1).  Under section 1502(4) of the Bankruptcy Code,

the term "foreign main proceeding" means "a foreign proceeding pending in the country where

---

[6]        Ms. Moran notes that a company would seek the appointment of JPLs and avail of the stay afforded by
section 97(1) of the Companies Act to facilitate a restructuring if: (a) there were issues with the propriety of actions
taken by management, with a view to suspending the powers of the directors and/or (b) the scheme of arrangement
was contentious including where there is a risk that minority creditor(s) might seek to frustrate the restructuring
through the presentation of a winding up petition.  (Third Moran Decl. ¶ 7.)

the debtor has the center of its main interests ."  11 U.S.C. § 1502(4); *see, e.g., In re Ocean Rig UDW Inc.*, 570 B.R. 687, 702 (Bankr. S.DN.Y. 2017) (recognizing foreign main proceeding); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416–17 (Bankr. S.D.N.Y. 2014) (recognizing foreign main proceeding); *see also Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 138 (2d Cir. 2013) (hereinafter "*Fairfield Sentry*") (affirming recognition of foreign main proceeding).  A Chapter 15 debtor's COMI is determined as of the filing date of the Chapter 15 petition, without regard to the debtor's historic operational activity.  *See Fairfield Sentry*, 714 F.3d at 137 ("[A] debtor's COMI should be determined based on its activities at or around the time the chapter 15 petition is filed, as the statutory text suggests.").

The Bankruptcy Code establishes that "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interests."  11 U.S.C. § 1516(c).  However, this presumption can be overcome.  *See, e.g. ABC Learning*, 445 B.R. 318, 328 (Bankr. D. Del. 2010); *aff'd*, 728 F.3d 301 (3d Cir. 2013) (stating that "the COMI presumption may be overcome particularly in the case of a 'letterbox' company not carrying out any business" in the country where its registered office is located); *In re Basis-Yield Alpha Fund (Master)*, 381 B.R. 37, 51–54 (Bankr. S.D.N.Y. 2008) (concluding that the absence of objections to COMI were not binding; the court must make an independent determination of COMI).

Courts consider several additional factors to determine whether the COMI presumption has been overcome, including: "the location of the debtor's headquarters; the location of those who actually manage the debtor . . . the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes."  *In re SphinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).  In *SphinX*, this court explained that these factors

should not be applied "mechanically"; rather, "they should be viewed in light of Chapter 15's

emphasis on protecting the reasonable interests of parties in interest pursuant to fair procedures

and the maximization of the debtor's value." *Id.*; *see also Fairfield Sentry*, 714 F.3d at 137

(explaining that "consideration of these specific factors is neither required nor dispositive" and

warning against mechanical application).  The *SphinX* court also noted that "because their money

is ultimately at stake, one generally should defer . . . to the creditors' acquiescence in or support

of a proposed COMI."  351 B.R. at 117.

    The Second Circuit and other courts often examine whether a Chapter 15 debtor's COMI

would have been ascertainable to interested third parties, finding "the relevant principle is that

the COMI lies where the debtor conducts its regular business, so that the place is ascertainable

by third parties.  Among other factors that may be considered are the location of headquarters,

decision-makers, assets, creditors, and the law applicable to most disputes." *Fairfield Sentry*,

714 F.3d at 130.  As the Second Circuit explained, by examining factors "in the public domain,"

courts are readily able to determine whether a debtor's COMI is in fact "regular and

ascertainable [and] not easily subject to tactical removal." *Id.* at 136–37; *see also In re British

Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI

should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr.

D. Nev. 2009) (looking to ascertainability of COMI by creditors).

    If a debtor's COMI has "shifted" prior to filing its Chapter 15 petition, courts may engage

in a more holistic analysis to ensure that the debtor has not manipulated COMI in bad faith.  *See*

*Fairfield Sentry*, 714 F.3d at 138 (concluding that "a court may look at the period between the

commencement of the foreign proceeding and the filing of the Chapter 15 petition to ensure that

a debtor has not manipulated its COMI in bad faith . . . .  The factors that a court may consider in

the analysis are not limited and may include the debtor's liquidation activities").  Courts ask

whether there is evidence pointing to any "insider exploitation, untoward manipulation, [and]

overt thwarting of third-party expectations" that would support denying recognition.  *Id.*; *see*

*also Ocean Rig*, 570 B.R. at 687 (granting recognition of foreign main proceeding where debtors

shifted COMI from jurisdiction that only provided a liquidation option to jurisdiction that

permitted reorganization, taking steps to shift COMI beginning one year before the foreign filing

and where notice was given to creditors throughout the process of shifting COMI).  The court in

*Suntech* noted how "[A] debtor's COMI is determined as of the time of the filing of the Chapter

15 petition," but, "[t]o offset a debtor's ability to manipulate its COMI, a court may also look at

the time period between the initiation of the foreign liquidation proceeding and the filing of the

Chapter 15 petition."  520 B.R. at 416.  Various factors could be relevant, such as "the location

of the debtor's headquarters; the location of those who actually manage the debtor (which,

conceivably could be the headquarters of a holding company); the location of the debtor's

primary assets; the location of the majority of the debtor's creditors or of a majority of the

creditors who would be affected by the case; and/or the jurisdiction whose law would apply to

most disputes."  *Id*.

In *Suntech,* the debtor's presumptive COMI was the Cayman Islands, where it was

incorporated, however, the Cayman Islands was not its actual COMI when the Foreign

Proceeding was commenced.  *Id*.  Notably, the *Suntech* debtor did not conduct any activities in

the Cayman Islands, and maintained its principal executive offices in Wuxi, China from where it

managed the Suntech Group.  *Id*.  So, the issue was whether the debtor's COMI should be

measured at the time of the commencement of the Chapter 15 case or when the Foreign

Proceeding was commenced.  *Id*.  But in *Suntech*, the Cayman Court appointed JPLs and

authorized them to exercise a host of additional powers (including acts on behalf of the debtor, possession of its property and collect all debts, dealing with all questions relating to or affecting the assets or the restructuring etc.) *Id.* at 417–18.  The JPLs assumed control of the debtor's affairs, met with employees and creditors, opened a bank account in the Cayman Islands funded with transfers from one of the debtor's other accounts, and filed claims. *Id.*  The *Suntech* court found the debtor's COMI on the date of the commencement of the chapter 15 case was the Cayman Islands and the JPLs did not manipulate the debtor's COMI in bad faith. *Id.*  Therefore, the court overruled a creditor's objection to finding the debtor's COMI to be in the Cayman Islands.

The *Suntech* court's analysis and conclusion that COMI was in the Cayman Islands was consistent with the Second Circuit's analysis in *Fairfield Sentry*.  In both cases, court-appointed fiduciaries assumed substantial control over the debtors' liquidation (in the case of *Fairfield Sentry*) and scheme proceeding (in the case of *Suntech*).  So, the question is whether the absence of court-supervised fiduciaries, such as JPLs, requires a different result in finding COMI in the Cayman Islands in this case given that no JPLs were appointed.  While this would be an easier case if JPLs had been appointed, the Court concludes that the Cayman court's supervision of the Debtor's Scheme Proceeding, in light of the other factors present here, is enough for the Court to conclude that the Debtor's COMI for the proceeding involving the single class of Existing Note holders was in the Cayman Islands.[7]

---

[7]      It would be ironic if a scheme proceeding, following the appointment of JPLs in a contentious case where JPLs were needed to facilitate agreement between the debtor and its creditors, was recognized as a foreign main proceeding, but in a case such as this one where the Debtor and its professionals successfully negotiated the RSA with overwhelming creditor support without the need to file a winding up petition and the appointment of JPLs before obtaining sanction of the Scheme could not be recognized as a foreign main proceeding.

### B.    Foreign Nonmain Proceeding

The Foreign Representative's counsel argues, in the alternative, that the Scheme

Proceeding satisfies the requirements to be a foreign nonmain proceeding.  Recognition and

enforcement can be granted as discretionary relief under sections 1507 and 1521 of the

Bankruptcy Code even in a nonmain proceeding.  The Court concludes that the Scheme

Proceeding was not a foreign nonmain proceeding.

Courts recognize a foreign proceeding as a "foreign nonmain proceeding" if "the debtor

has an establishment within the meaning of section 1502 in the foreign country where the

proceeding is pending."  11 U.S.C. § 1517(b)(2).  Section 1502(2) defines "[e]stablishment" as

"any place of operations where the debtor carries out a nontransitory economic activity."  11

U.S.C. § 1502(2); *see also In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R.

63, 70 (Bankr. S.D.N.Y. 2011), *aff'd* 474 B.R. 88 (S.D.N.Y. 2012) ("*Millennium Glob. I*").

Additionally, courts have required proof of more than a "mail-drop presence" to satisfy the

establishment requirement.  *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 277

(Bankr. S.D.N.Y. 2019) ("*Constellation I*") (citation omitted).  Due to the "paucity of U.S.

authority" on this question, the court in *Millennium Glob. I* cited a "persuasive" English law

holding that the presence of an asset and minimal management or organization can create a

debtor establishment.  458 B.R. at 84–85 (citing *Shierson v. Vlieland-Boddy*, [2005] EWCA Civ.

974, [2005] W.L.R. 3966 (2005)).

Whether the debtor has an "establishment" in a country is determined at the time of filing

the Chapter 15 petition.  *See Beveridge v. Vidunas (In re O'Reilly)*, 598 B.R. 784, 803 (Bankr.

W.D. Pa. 2019).  Several factors "contribute to identifying an establishment: the economic

impact of the debtor's operations on the market, the maintenance of a 'minimum level of

organization' for a period of time, and the objective appearance to creditors whether the debtor

has a local presence." *Millennium Glob. I*, 458 B.R. at 32. *See In re Creative Fin., Ltd.*, 543

B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (citing *In re Bear Stearns High-Grade Structured Credit*

*Strategies Master Fund, Ltd.*, 374 B.R. 122, 131 (Bankr. S.D.N.Y. 2007)) (finding that an

"establishment" requires a "showing of a local effect on the marketplace, more than mere

incorporation and record-keeping and more than just the maintenance of property.") This is

evidenced by engagement of "local counsel and commitment of capital to local banks."

*Millennium Glob. I*, 458 B.R. at 86–67. *See also Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1028

(5th Cir. 2010) (If a foreign "bankruptcy proceeding and associated debts [themselves] . . .

demonstrate an establishment . . . [t]here would be no reason to define establishment as engaging

in a nontransitory economic activity. The petition for recognition would simply require evidence

of the existence of the foreign proceeding."); *Rozhkov v. Pirogova (In re Pirogova)*, 612 B.R.

475, 484 (S.D.N.Y. 2020) (finding that a foreign insolvency proceeding on its own cannot

suffice to count as nontransitory economic activity in support of recognition as a foreign

nonmain proceeding.)

### III.  DISCUSSION

For the reasons outlined below, the Court **GRANTS** the Motion for recognition of the

Cayman Proceeding as a foreign main proceeding. The Court does not explicitly address the

following aspects of the Motion because they are uncontroversial and satisfied by the

uncontested facts: (i) whether the Debtor meets the eligibility requirements under section 109(a)

of the Bankruptcy Code; (ii) whether the Cayman Proceeding is a foreign proceeding as defined

in section 101(23) of the Bankruptcy Code; (iii) whether the Cayman Proceeding has been

commenced by a duly authorized foreign representative; (iv) whether the Scheme Petition meets

the requirements of section 1515 of the Bankruptcy Code; (v) whether the Debtor is entitled to

additional relief under section 1521 of the Bankruptcy Code; (vi) whether the Scheme is

procedurally fair; (vii) whether the interests of creditors and other interested parties are

sufficiently protected; (viii) whether the Foreign Representative is entitled to additional relief

under section 1507 of the Bankruptcy Code; and (ix) whether recognition of the foreign

proceeding is contrary to the public policy of the United States.

### A.    Recognition is Not Warranted as a Foreign Nonmain Proceeding.

The Court finds that recognition of the Cayman Proceeding as a foreign nonmain

proceeding is not warranted because recognition would be inconsistent with the goals of foreign

nonmain proceedings.  Further, neither the bankruptcy proceeding itself nor the Debtor's

bookkeeping activities constitute nontransitory economic activity, and the Debtor does not

otherwise affect the local marketplace in the Cayman Islands.

### 1.    Recognition as a Nonmain Proceeding Would Be Inconsistent with the Goals of UNCITRAL Model Law

The Court declines to recognize the Cayman Proceeding as a foreign nonmain proceeding

because such a recognition would not comport with the stated goals of foreign nonmain

proceedings.  The UNCITRAL Model Law on Cross-Border Insolvency explains that in a

foreign nonmain proceeding, "the court must be satisfied that the action relates to assets that,

under the law of this State, should be administered in the foreign non-main proceeding."  UNITED

NATIONS, UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY WITH GUIDE TO

ENACTMENT AND INTERPRETATION, 12 (2014) (the "GUIDE").  The GUIDE further explains that

"[u]nlike 'foreign main proceeding,' there is no presumption with respect to the determination of

establishment . . . [t]he commencement of insolvency proceedings, the existence of debts, and

the presence alone of goods in isolation, of bank accounts, or of property would not in principle

satisfy the definition of establishment." *Id.* at 47.  These provisions support the administration of a restructuring proceeding by a single foreign court.

In the present case, the Cayman Scheme pertains to the Existing Notes held by the Scheme Creditors.  (Motion ¶ 13.)  The language of the UNCITRAL Model Law on Cross-Border Insolvency therefore requires, for the purposes of recognition of the Cayman Proceeding as a foreign nonmain proceeding, that the Existing Notes be assets in the Cayman Islands. However, this Court is not persuaded that the Existing Notes are assets within the meaning of Article 23, subsection 2 of the Model Law.  As the GUIDE explains, "the existence of debts . . . would not in principle satisfy the definition of establishment."  GUIDE at 47.

> 2. There is Insufficient Evidence to Support a Finding of Nontransitory Economic Activity in the Caymans

The Cayman restructuring cannot itself constitute nontransitory economic activity to support recognition as a foreign nonmain proceeding.  In *Lavie v. Ran*, 406 B.R. 277, 286–87 (S.D. Tex. 2009), the bankruptcy court explained that if "the proceeding and associated debts alone could suffice to demonstrate an establishment, it would essentially rule out the possibility that any proceeding would fall into the . . . category of proceedings that are neither foreign main nor foreign nonmain.  But, this third category was clearly envisioned by the drafters."  Further, in *In re Pirogova*, 612 B.R. at 484, the court cited *Ran* and agreed that if "a foreign trustee could merely point to a foreign bankruptcy itself, which is subject to a recognition petition, as evidence of an establishment, the statutory requirements for recognition would be pointless."  The court in *Pirogova* denied recognition of a foreign nonmain proceeding despite the Debtor's ownership of an apartment in Russia, her Russian utility bills, her vehicles in Russia, and her Russian yacht club membership, as well as the debtor's ongoing bankruptcy proceeding in Russia.  *Id.* at 480.

In the present case, the Debtor's connections to the Cayman economy are far more tenuous than those discussed in *Pirogova*. The Debtor maintains a registered office in the Cayman Islands to which all communications may be addressed or served, and where the administration of annual filings and the payment of annual fees are registered. (Supp. Brief ¶ 1.) The Debtor also initiated the restructuring proceeding in its country of incorporation, the Cayman Islands. (*Id.*) However, the Debtor has been unable to point to any additional connections to the Cayman Islands that might constitute nontransitory economic activity, and therefore falls well short of the standards set in *Ran* and *Pirogova*.

### 3.   The Debtor's Business Activities Have No Local Effect on the Marketplace

The court explained the standard for nontransitory economic activity in *In re Creative Fin., Ltd.*, 543 B.R. at 520–21. There, the court explained that recognition required "a showing of a *local effect on the marketplace*, more than mere incorporation and record-keeping and more than just the maintenance of property." *Id.* at 520 (emphasis added). In that case, the debtor, a foreign exchange trading business, was organized under the laws of the BVI, and admittedly engaged in bad-faith actions to pursue a restructuring proceeding there. *Id.* at 513. Nevertheless, the tenuous nature of the connection between the debtor's business activities and the BVI marketplace supported the court's denial of recognition as a foreign nonmain proceeding. *Id.* at 521.

In the present case, despite the absence of apparent bad faith, the Debtor similarly has a negligible effect on the local marketplace. The Debtor is a Cayman-incorporated investor and developer in real-estate that carries out its business in the PRC and maintains its books and records in the Cayman Islands. (*Id.* ¶¶ 6–7, 64.) However, the Debtor has not provided the Court evidence of "more than mere incorporation and record-keeping and more than just the

maintenance of property." *In re Creative Fin., Ltd.*, 543 B.R. at 520. The failure to engage the local economy excludes the Debtor from a foreign nonmain classification.

**B.      Recognition Is Warranted as a Foreign Main Proceeding**

The Court recognizes the Debtor's COMI in the Cayman Islands. Section 1516(c) provides that "[i]n the absence of evidence to the contrary, the debtor's registered office . . . is presumed to be the center of the debtor's main interest." 11 U.S.C. § 1516(c). Given the evidence in this case, the Court considers the totality of the circumstances before it, including the goals of Chapter 15, the Scheme Creditors' expectations and intentions, the judicial role in the Cayman Scheme, the function of the Cayman Scheme Chairperson, the insolvency activities in the Caymans, Cayman choice of law principles and the Debtor's good-faith petition for recognition of the Cayman Proceeding. Each of these factors function together to support a finding of COMI in the Cayman Islands.

1.    Recognition as a Foreign Main Proceeding is Consistent with the Goals of Chapter 15

Recognition of the Cayman proceeding as a foreign main proceeding would comport with the goals of Chapter 15. In *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. at 126, *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008), the court explained that:

> Unique to the Bankruptcy Code, Chapter 15 contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross–Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses. 11 U.S.C. § 1501(a)(1)–(5); *In re SPhinX, Ltd.*, 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).

Chapter 15 contemplates cooperation between American and foreign bankruptcy courts, as well as facilitating protection for the Debtor in this case before the Court.

The Second Circuit has recognized that "[t]he absence of a statutory definition for a term that is not self-defining signifies that the text is open-ended, and invites development by courts, depending on facts presented, without prescription or limitation." *Fairfield Sentry*, 714 F.2d at 138.

Here, the Debtor argues that denial of recognition of the Debtor's COMI in the Cayman Islands may leave the Debtor "with the alternative of converting a highly consensual Scheme into a Cayman liquidation in an effort to obtain such chapter 15 recognition at a later date." (Supp. Brief ¶ 23.) The Debtor also contends that this "would not maximize the value of the Debtor's assets, as it would divert additional funds towards an entirely new insolvency process in an effort to potentially achieve the relief requested" in the Motion. (*Id.*) Such an outcome would clearly diverge from Chapter 15's stated goal of maximizing the value of the debtor's assets, as well as facilitating the rescue of a financially troubled business. Further, recognition of the Cayman Proceeding would promote cooperation between the American and Cayman courts, by helping facilitate the Cayman Proceeding and maximizing the chances of a successful reorganization.

2.   Recognition of this Proceeding is Consistent with Creditors' Expectations

The Scheme Creditors' expectations that their loan agreements would be governed by Cayman law supports recognition of COMI in the Cayman Islands. (Supp. Brief ¶ 11.) When determining a Debtor's COMI, "creditor expectations can be evaluated through examination of the public documents and information available to guide creditor understanding of the nature and risks of their investments." *In re Oi Brasil Holdings Cooperatief U.A.*, 578 B.R. 169, 228 (Bankr. S.D.N.Y. 2017); *see also Constellation I*, 600 B.R. at 274 (listing cases in which offering

memoranda and indentures were evaluated for purposes of determining creditors' expectations).

Here, this expectation was reasonable considering the publicly available descriptions of the

Debtor as a Cayman company in (i) the offering memoranda of the Existing Notes that stated that

"an insolvency proceeding relating to us, even if brought in the United States, would likely

involve Cayman Islands insolvency law" and (ii) the Debtor's press releases, pointing to the

Debtor as a company "incorporated in the Cayman Islands."  (Supp. Brief ¶ 11.)

The Debtor's actions reinforced these expectations, particularly the fact that (i) BFAM

initiated negotiations related to the Restructuring by issuing the Statutory Demand and

threatening a Cayman Islands winding up petition and (ii) the RSA contemplated an insolvency

proceeding in the Cayman Islands.  (*Id*.)  It is incontrovertible that the Scheme Creditors

understood that the Debtor is a Cayman Islands company and expected that its debts would be

restructured pursuant to the law of the Cayman Islands if a restructuring became necessary.  (*Id*.)

*See In re Ascot Fund Ltd.*, 603 B.R. 271, 283 (Bankr. S.D.N.Y. 2019) (finding COMI in the

Caymans, in part, because "[f]rom the Ascot Fund investors' point of view, and as a matter of

fact and law, they invested in a Cayman fund and their rights were to be determined under

Cayman law.")

In *In re SPhinX, Ltd.*, 351 B.R. at 117, the Court explained that "[v]arious factors, singly

or combined, could be relevant" to a COMI determination.  The factors are not meant to be

applied "mechanically," but rather, "viewed in light of chapter 15's emphasis on protecting the

reasonable interests of parties in interest pursuant to fair procedures and the maximization of the

debtor's value."  *Id*.  The *SPhinX* court reasoned that "because their money is ultimately at stake,

one generally should defer, therefore, to the creditors' acquiescence in or support of a proposed

COMI."  *Id*.  In *SPhinx*, ultimately, the Court found that COMI was outside of the Caymans, but

the concept remains, when a Court considers COMI factors, the protection of the creditors'
interests is paramount.  *Id.*

The decision in *In re Serviços de Petróleo Constellation S.A.* ("*Constellation II*") also
underscores how "Courts in the Second Circuit also look to the expectations of creditors with
regard to the location of a debtor's COMI."  613 B.R. 497 (Bankr. S.D.N.Y. 2019) (finding
COMI in Luxembourg, in part, because the creditors' expectations of the location of the
insolvency proceeding); *see In re Chiang*, 437 B.R. 397 (Bankr. C.D. Cal. 2010) (noting how
"the location of the COMI is an objective determination based on the viewpoint of third parties
(usually creditors)"); *see also In re Codere Finance 2(UK) Ltd.*, Case No. 20-12151 (MG),
(Bankr. S.D.N.Y. Oct. 9, 2020) ("*Codere* Transcript," ECF Doc. # 13 at 21:17–23:6) (concluding
that COMI in the UK was supported by lack of objections, overwhelming support of the scheme,
no evidence of exploitation or untoward manipulation or thwarting of third-party expectations,
and interests of creditors and other interested parties sufficiently protected).

In *In re Oi Brasil Holdings*, 578 B.R. at 226–229, the court considered whether, having
initially recognized Brazil as the Debtor's COMI, subsequent events caused the COMI to shift to
the Netherlands.  To evaluate whether the COMI had shifted, the court considered creditor
expectations, concluding "that purchasers of the notes understood that they were investing in
Brazilian-based businesses, and [the debtor's] place of incorporation, or for that matter its very
existence, was immaterial to their decision to purchase their notes."  *Id.* at 229.  It was notable in
this case that "the [noteholders] had no legitimate expectation that the Austrian courts would
play any role in the determination or payment." *Id.* at 226;*see also In re Olinda Star Ltd.*, 614
B.R. 28, 44 (Bankr. S.D.N.Y. 2020) (holding third party and creditors' expectations weigh in

favor of finding COMI); *Constellation II*, 613 B.R. at 508 (noting "[c]ourts in the Second Circuit also look to the expectations of creditors with regard to the location of a Debtor's COMI.")

In the present case, the Scheme Creditors made loans to Modern Land, a Cayman-incorporated holding company that carries out the business of real estate development in the PRC. (Motion ¶¶ 6–7.) Given the statutory presumption included in section 1516(c) of the Bankruptcy Code, the creditors could reasonably have concluded that the Debtor's registered office in the Cayman Islands was its COMI, subjecting it to the Cayman Companies Act, and in turn subjecting the creditors' agreements with the Debtor to Cayman law. Further, "nearly half of the Debtor's wholly owned subsidiaries are Cayman entities." (Supp. Brief ¶ 7.) Given the proclivity of Courts in the Second Circuit to consider creditor expectations when making a COMI determination, therefore, this factor supports a finding of the Cayman Islands being the Debtor's COMI.

The creditor expectations in this case are further evidenced by the overwhelming creditor support. Not one Scheme Creditor objected to the Debtor's COMI being located in the Cayman Islands, including the two dissenting Scheme Creditors that voted against the Scheme. (Supp. Brief ¶ 12.) Over 99% in number of the Scheme Creditors present and voting at the Scheme Meeting, representing approximately 95% in value of the outstanding principal of the Existing Notes, voted in favor of the Scheme. (*Id.*, Supp. Moran Decl. ¶ 4.) In this case, definitive creditor expectations and overwhelming creditor support solidify a finding of COMI in the Cayman Islands.

3.   The Judicial Role in the Cayman Scheme is Prevalent in this Case

Another factor supporting COMI being in the Cayman Islands is the ongoing restructuring proceeding itself. In *In re Suntech Power Holdings Co.*, 520 B.R. at 418, a

Cayman-incorporated holding company primarily conducting business in China filed for Chapter 15, seeking recognition.  Over creditors' objections, this Court found COMI in the Cayman at the time of the filing, while acknowledging that COMI had been in China prior to the filing.  *Id.*  The *Suntech* court discussed at length the role of the JPLs, who conducted much of the Debtor's business from the Cayman Islands following the petition.  *Id.*

In the present case, unlike in *Suntech*, there are no objections to recognition as a foreign main proceeding.  The Scheme Creditors in this case overwhelmingly approved the Scheme. (Motion ¶ 65.)  Modern Land is not subject to the control of JPLs, but there were no issues about the propriety if any actions by management, and the Debtor and its professionals successfully negotiated an RSA with very broad creditor support.  (Third Moran Decl. ¶ 7.)  There was no need for the appointment of JPLs.  (Supp. Brief ¶ 16.)

Furthermore, the Debtor in this case identifies itself as a Cayman-incorporated company in press releases and in official memoranda.  (*Id.* ¶ 1.)  The Debtor maintains its registered office in the Cayman Islands, and maintains a statutory register of members (i.e. shareholders), mortgages, charges, and directors in the Cayman Islands.  (*Id.*)  The Debtor's historical corporate counsel, who additionally advised the Debtor on the issuance of the Existing Notes, is a law firm located in the Cayman Islands.  (*Id.* ¶ 2.)  The offering memoranda for the Existing Notes indicated in several places that, if needed, the Debtor would initiate an insolvency proceeding in the Cayman Islands.  (*Id.* ¶ 3.)  Lastly, the first demand upon the Debtor following its initial default under the Existing Notes threatened a winding up petition pursuant to the laws of the Cayman Islands.  (*Id.* ¶ 4.)

The RSA expressly requires a Cayman Islands scheme of arrangement, and approximately 80.75% of the aggregate principal outstanding amount of all Existing Notes

acceded to the RSA.  (*Id.* ¶ 5.)  No Scheme Creditors objected to the Debtor's COMI being located in the Cayman Islands, and 99% in number of the Scheme Creditors present and voting at the Scheme Meeting representing approximately 95% in value of the outstanding principal of the Existing Notes, voted in favor of the Scheme.  (*Id.* ¶ 12.)

Cayman law further provides that only the Cayman Court can conduct an effective liquidation of a Cayman Islands-incorporated company.  (Third Moran Decl. ¶ 16.)  The Debtors assert that, pursuant to Cayman law, a suit against a member of the Debtor's board of directors would require the application of Cayman law, even if such director did not live in the Cayman Islands.  (*Id.* ¶ 24.)  Next, nearly half of the Debtor's direct wholly owned subsidiaries are Cayman entities. (Supp. Brief ¶ 7.)  The Debtor further identified at least 35 entities— representing a minimum of over half a billion dollars of the outstanding principal of the Existing Notes—that are domiciled in the Cayman Islands.  (*Id.*)

The Debtor asserts, importantly, that as of the time of the filing of the Chapter 15 petition, the restructuring efforts were the Debtor's "primary business activity . . . to ensure the Debtor's survival."  (*Id.* ¶ 8.)  The "vast majority of Restructuring-related activities took place in the Caymans," and the Debtor's Cayman counsel advised the Debtor as a matter of Cayman Islands law.  (*Id.*)  For example, the Scheme Meeting took place in the Cayman Islands, the Scheme Meeting was presided over by a Cayman Islands resident, and the chairman of the meeting held proxies for the majority of the Scheme Creditors and attended and voted at the meeting in the Cayman Islands on their behalf.  (*Id.*)  The Debtor's Cayman counsel also appeared at both hearings before the Cayman Court to obtain permission to convene the Scheme Meeting and to sanction the Scheme.  (Third Moran Decl. ¶ 25.)  The Scheme received the support of Scheme Creditors representing approximately 95% of the value of the Existing Notes.

(Supp. Brief ¶ 9.)  Given the strong support for the Scheme, the fact that the restructuring was the primary business activity of the Debtor at the time of the filing of the Chapter 15, the ongoing activities pertaining to the restructuring itself support recognition of the Cayman Islands as the Debtor's COMI in the present case.

Further, the fact that the Debtor is an exempted company does not jeopardize its ability to have a COMI in the Cayman Islands.  The Debtor was incorporated in the Cayman Islands under the Companies Act as an exempted company with limited liability.  (Motion ¶ 6.)  While the Debtor's exempted company status places certain limitations upon its operations in the Cayman Islands, this Court has held that exempted companies can have a Cayman COMI.  In *Ocean Rig*, 570 B.R. at 705, this Court held that "[i]t also does not matter that [the debtor] is classified as 'exempted' under the Cayman Companies Law, even though 'exempted' company status appears to limit that company's activities in the Cayman Islands . . . [w]hile exempted companies are prohibited from *trading* in the Cayman Islands, except in furtherance of their business outside the Cayman Islands, they may still be *managed* from there."  The *Ocean Rig* Court subsequently concluded that the Cayman Islands was indeed the debtor's COMI, and recognized the foreign main proceeding.  *Id.* at 707.  Therefore, in the present case, the Debtor's status as an exempted company does not jeopardize its COMI in the Cayman Islands.

4.   Choice of Law Principles Support a Finding of COMI in the Cayman Islands

When conducting a COMI analysis, Courts in this Circuit additionally consider the jurisdiction whose law would apply to most disputes.  *Olinda Star*, 614 B.R. at 43.  "[T]his factor weighs in favor of a COMI in" the jurisdiction whose law applies.  *Id.* at 44; *see also* *Constellation I*, 600 B.R. at 280 (stating that "because Parent/Constellation is a Luxembourg incorporated entity, that depends upon Luxembourg law for its existence and its corporate

operations, the Court found that Luxembourg law should be considered the law that applies to *most* of Parent/Constellation's disputes").  In the present case, the Foreign Representative explained that the Debtor, as a Cayman-incorporated company, "depends on Cayman Islands law for its existence and is subject to Cayman Islands laws and regulations."  (Supp. Brief ¶ 13.)  The Foreign Representative further explained that the requirements of Cayman law were "made clear in the documents related to the issuance of the Existing Notes."  (*Id.*)  While the Existing Notes as governed by New York law, the Cayman Islands is the jurisdiction whose law would apply to most disputes over corporate actions that may arise in the Cayman Proceeding, this factor supports finding a COMI in the Cayman Islands.  And, to the extent that any New York law issues arose concerning the Existing Notes, the Second Circuit explained in *JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 424 (2d Cir. 2005), that "[w]e have repeatedly held that U.S. courts should ordinarily decline to adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding."

The Scheme Creditors here include only holders of Existing Notes.  The Debtor's capital structure includes substantial debt governed by Hon Kong law.  The Court has no reason to address the COMI of any insolvency or scheme proceeding involving creditors with claims other than holders of the Existing Notes.  Creditor expectations in such a case could point to COMI somewhere other than the Cayman Islands.

### 5.   The Debtors Seek Recognition in Good Faith

Many of the cases in which courts have denied recognition of a foreign main proceeding in a debtor's country of incorporation involved instances of bad faith, which are not present in the Debtor's petition for recognition.  For example, in *Creative Finance*, the court found that the debtor's principal "and his associates—and hence the Debtors—were guilty of bad faith in

numerous respects." 543 B.R. at 513.  Among other transgressions, the debtors in *Creative Finance* sought to manipulate a liquidator, ignored important inquiries, and sought to deny a disfavored creditor the opportunity to benefit from the proceeding.  *Id.*  In contrast, in *Fairfield Sentry Ltd.*, 440 B.R. at 64-65, the Court held that "[t]here being no showing of bad faith on the part of the BVI Liquidators, and given that the [d]ebtors are incorporated in and maintain their registered offices in the BVI, the Court finds it more compelling that the [d]ebtor's COMI lies in the BVI."  *See also Codere* Transcript at 20:1–21:25 (reasoning that "the lack of objections and the overwhelming support for the scheme of arrangement in this case suggests that there has not been insider exploitation, untoward manipulation, overt thwarting of third-party expectations. . . . Those sorts of things could evidence bad faith COMI manipulation.").

*SPhinX* was even more explicit in its consideration of the Debtor's bad faith as the basis for rejecting recognition.  There, the Bankruptcy Court explained that "a primary basis for the Petition, and the investors' tacit consent to the Cayman Islands proceedings as foreign main proceedings, is improper . . . this litigation strategy [seeking to frustrate a settlement agreement by exploiting the automatic stay] appears to be the only reason for their request for recognition." *In re SPhinX*, 351 B.R. at 121.  The *SPhinX* Court therefore rejected a finding of COMI supporting recognition of a foreign main proceeding, and instead proceeded to consider the existence of a foreign nonmain proceeding not subject to the debtor's bad faith.  *Id.*

In *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, the court denied recognition of a Cayman scheme proceeding seeking to restructure an open-end investment firm as either a foreign main or nonmain proceeding.  374 B.R. at 126.  The *Bear Stearns* court emphasized the Debtor's operational history, considering the location of its employees, managers, books and records, and liquid assets.  *Id*. at 130.  The court therefore

denied recognition of COMI in the Cayman Islands because the United States, not the Cayman

Islands, was "the place where the Funds conduct the administration of their interests on a regular

basis." *Id.* However, *Fairfield Sentry* subsequently clarified that:

> A court may look at the period between the commencement of the
> foreign proceeding and the filing of the chapter 15 petition to
> ensure that a debtor has not manipulated its COMI in bad faith, but
> there is no support for [the] contention that a debtor's entire
> operational history should be considered.  The factors that a court
> may consider in this analysis are not limited and may include the
> debtor's liquidation activities.

714 F.3d at 138.

The *Fairfield Sentry* court also emphasized that "[t]here was no finding of bad-faith

COMI manipulation." *Id.* at 139.  In the present case, like in *Fairfield Sentry*, the Debtor is a

holding company with subsidiaries that conduct business around the world.  (Motion ¶ 7.)  The

Debtor is similarly engaged in a restructuring proceeding pursuant to the laws of its country of

incorporation.  (*Id.* ¶ 21.)  The *Fairfield Sentry* court explained that "[it] matters that the inquiry

under Section 1517 is whether a foreign proceeding '*is pending* in the country where the debtor

*has* the center of its main interests.' 11 U.S.C. §1517(b)(1) (emphasis added)."  714 F.3d at 134.

The same is true in this case too.

In *In re Ran*, 390 B.R. 257 (Bankr. S.D. Tex. 2008), the bankruptcy court denied

recognition of an Israeli bankruptcy proceeding as either a foreign main or nonmain proceeding.

On remand from the district court, the bankruptcy court "decline[d] to make findings on whether

or not Lavie [a trustee overseeing the bankruptcy] acted in bad faith." *Id.* at 298.  However, the

court explained that "[b]y citing favorably to *In re SPhinX*, . . . in its order of remand, the district

court suggests that a foreign representative's bad faith motive in seeking recognition of a foreign

proceeding may appropriately be considered in determining the location of a debtor's center of

main interests." *Id.* at 297.  Indeed, despite the court's distaste for making findings based upon the debtor's apparent bad faith, the court nevertheless devoted an entire section of its analysis to the foreign representative's motive.  *Id.* at 295.  So, while the presence of bad faith did not play an explicit role in the court's decision in *Ran*, the questionable motivations of the foreign representative clearly informed the court's analysis.

In the present case, the Debtor has not engaged in COMI-shifting behavior, nor has it sought to deceive the Court or the Scheme Creditors in its pursuit of a Cayman restructuring.  Instead, as discussed above, the Debtor seeks recognition of a proceeding under Cayman law, a fact which the Scheme Creditors likely factored into their decision to conduct business with the Debtor in the first place.[8]  Given the absence of COMI-shifting and the Debtor's good-faith petition for recognition under chapter 15, this factor supports recognition of COMI in the Cayman Islands.

## IV. CONCLUSION

For the reasons explained above, the Court **FINDS** that the Cayman Islands is the Debtor's COMI.  All other requirements for recognition have been satisfied.

---

[8]    *See Suntech*, 520 B.R. at 418:

> Nor does the evidence support a finding that the Debtor's creditors would have expected it to restructure its businesses in China.  The Debtor's largest creditor group was the Noteholders.  The Indenture was governed by New York law and the parties to the Indenture submitted to the non-exclusive jurisdiction of the New York state and federal courts.  In addition, when the representatives . . . who held approximately 50% of the debt, met with the Debtor's representatives, they urged the Cayman Islands as the most logical restructuring venue.  The Debtor was incorporated in the Cayman Islands and the Cayman Islands employed a predictable, flexible and cost effective method for dealing with restructuring.

Therefore, the Court recognizes the Cayman Proceeding as a foreign main proceeding.

Additionally, the Court, in the exercise of discretion, recognizes and enforces the Cayman

Scheme.

A separate order will be entered granting the requested relief.

Dated:    July 22, 2022
          New York, New York

_Martin Glenn_
_____
MARTIN GLENN
Chief United States Bankruptcy Judge